* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral argument before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and, upon reconsideration, the Full Commission reverses the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. This case and the parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. All parties are properly before the Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter.
3. An employment relationship existed between the named employee and the named employer on or about October 11, 2001.
4. The Hartford was the carrier liable on the risk for the injury occurring on or about October 11, 2001.
5. Plaintiff's average weekly wage is $701.29.
6. Plaintiff-Employee sustained an injury by accident on or about October 11, 2001.
7. The injury by accident was an electrocution which arose out of and in the course of employment and is compensable.
 * * * * * * * * * * *
The following documentary evidence was received as:
 EXHIBITS
Stipulated Exhibit #1: Medical Records
Stipulated Exhibit #2: IC Forms
Stipulated Exhibit #3: Plaintiff's Personnel File
Depositions: Dr. Nitka, Dr. Schulhof
 * * * * * * * * * * *
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty years old. On October 11, 2001 he was employed by defendant, Huffman Oil Company, as a *Page 3 
manager of a convenience store located in Archdale, North Carolina. At the time he was an 11 year employee of defendant Huffman Oil Company. His duties included the daily operations, ordering products, stocking, tracking inventory and hiring and firing personnel.
2. On October 11, 2001, plaintiff was cleaning the windows of the front of the store. He was standing on a metal ladder, holding the ladder with his left hand and cleaning with a wet rag in his right hand. The windows were framed in metal. As he wiped the wet rag across the top of a metal frame, it hit an exposed electrical wire shocking the plaintiff. The electrical shock jerked his body into a rigid state.
3. Plaintiff was seen at the High Point Regional Health System's emergency room on October 11, 2001. He was written out of work for two days and did not work again until Monday, October 15, 2001. Plaintiff returned to the emergency room on October 15, 2001. He complained of heaviness in his left arm for the preceding two to three days. He stated his whole left arm felt heavy and slightly numb. He was prescribed a six-day Prednisone Dos-Pak. He was placed on light-duty work through October 18th and was told to follow up with doctors at High Point Neurological Associates.
4. Plaintiff was next seen on October 29, 2001 by Dr. Elaine R. Feraru, a neurologist at High Point Neurological Associates. His chief complaints — "Left hand and arm pain, heavy feeling, pain comes and goes, but when the pain hits it's severe." Dr. Feraru's impression was "fairly significant electric shock in both arms." Plaintiff described the electrical shock to Dr. Feraru, describing left arm symptoms since the event.
5. Plaintiff was seen again by Dr. Feraru on December 4, 2001. He complained of left arm pain as follows: "Sometimes arm throbs; still some pain; tingling; some numbness." Dr. *Page 4 
Feraru's impression was "left arm 10/11/01, still with some pain." She prescribed Neurontin and Ovidis.
6. Thereafter, over the coming eighteen months, January 15, 2002 through June 3, 2003, plaintiff was seen by Dr. Feraru twelve times, each time consistently complaining of left arm pain, variously described as follows: "throbs — weak — tingling — numbness — achy — increased pain with lifting — feels like it's getting worse — numb and tingling — no arm strength — hurts to even pick arm up — weak — shooting pain — shooting pain all through arm — loss of strength — throbbing/shooting — really weak — decreased sense."
7. Later in June, after the June 3, 2003 visit to Dr. Feraru, plaintiff's condition worsened, and he began to experience pain in his neck and shoulder and his left arm pain got worse. He had not suffered any new trauma.
8. On June 11, 2003, plaintiff called Dr. Feraru's office and asked for an increase in his Vicodin. The noted complaint was "severe pain."
9. On June 20, 2003, plaintiff visited Greensboro Orthopedic Center complaining of "severe pain in the left shoulder and neck, starting about two weeks prior, and numbness and tingling in the left arm." He was seen initially by Dr. Carter on June 20, 2003, who ordered an MRI and took plaintiff out of work for one week. Plaintiff returned again to Dr. Carter, who extended the out of work order until Monday, June 30, 2003. The MRI revealed a combination of central and right paracentral disc herniation at C4-5 and moderate sized left paracentral and foraminal disc herniation at C5-6.
10. Subsequently, plaintiff was referred to Dr. James R. Nitka, a board certified orthopaedic surgeon with an emphasis on spine surgery. Plaintiff first saw Dr. Nitka on July 2, 2003. *Page 5 
11. On July 11, 2003, plaintiff visited Dr. Feraru and reported that Dr. Nitka had diagnosed ruptured discs and that he was going to have surgery. On that date, Dr. Feraru noted — "History electrical injury left arm may have injured neck at same time."
12. On July, 18, 2003, plaintiff underwent an anterior cervical diskectomy and fusion at C4-C5 and C5-C6 with excision of herniated nucleus pulposus central and left-sided at C5-C6, central and right-sided at C4-C5, right iliac crest bone graft harvested through a separate incision. Dr. Nitka was the surgeon.
13. Over the two months following surgery, the arm pain that plaintiff had been experiencing for nearly 21 months went away. On October 20, 2003, plaintiff returned to Dr. Feraru and reported that his arm pain of nearly two years was "gone."
14. Plaintiff continued to follow up with Dr. Nitka, seeing Dr. Nitka on at least eight occasions with no complaints of left arm pain.
15. Dr. Nitka opined that it was his opinion that the disc herniations, prompting the fusions at C4-5 and C5-6, were more likely than not related to and secondary to the electrical shock sustained by the plaintiff and that the increased symptoms occurring in June 2003 were a worsening of plaintiff's previous condition related to the electrical shock. Dr. Nitka based his opinion, in part, on the following: that the left arm symptoms were temporarily related to the electrical shock and continued until the pressure from the herniated discs was taken off the nerve; that with neck injuries, the primary pain is in the extremity; that he has often seen patients with disc herniations in the neck with very little neck pain, and, in fact, with none at all; and, that patients who have disc herniations in the neck don't always have neck pain, but they generally have severe arm pain. Commenting specifically on the absence of complaints of neck pain until June 2003, Dr. Nitka testified that cervical disc herniation without neck pain does occur, that he *Page 6 
has seen it in his practice, and that it is described in literature. Dr. Nitka further noted that informing his opinion was that Dr. Feraru, in her notes, described left arm pain along certain nerve distributions consistent with the disc herniations suffered by plaintiff.
16. Dr. Feraru opined that, given the temporal relationship between the shock of October 11, 2001 and the onset of left arm symptomology and the relief of those symptoms following the fusions at C4-5 and C5-6, the left arm symptoms for which she had been following plaintiff all along were, more likely than not, secondary to the disc herniations which prompted the fusion at C4-5 and C5-6.
17. Defendant's retained expert, Dr. Larry Allen Schulhoff, a board certified neurosurgeon. Dr. Schulhoff opined that with a disc herniation in the neck, one will typically experience contemporaneous neck pain, and that because the medical record reflects no complaints of neck pain until June 2003, the cervical disc herniations did not occur until June 2003. However, he did concede that the event described by plaintiff could have caused the disc herniations and that one can have ruptured discs in the neck with arm pain and have no neck pain at all. When asked to opine on the significance of the resolution of arm pain following decompression of the nerves compressed by the herniations, Dr. Schulhoff stated that the pain likely has not gone away; rather, plaintiff is likely distracted and does not realize he is still in pain.
18. Based on plaintiff's significant history of treatment with Drs. Nitka and Feraru, the Full Commission gives greater weight to their opinions.
19. Based on the greater weight of the evidence, the Full Commission finds that the electrocution sustained by plaintiff on October 11, 2001 was an injury by accident arising out of and in the course of his employment with defendant-employer. *Page 7 
20. The evidence indicates that plaintiff's left arm complaints began after the October 11, 2001 electrocution. Additionally, the evidence shows that with neck injuries, the primary pain may be in the extremities. Accordingly, the Full Commission finds that as a result of the October 11, 2001 injury by accident, plaintiff suffered herniated discs at C4-5 and C5-6 and the increased symptoms in June 2003 were a worsening of this condition.
21. Following the fusion plaintiff complained of neck pain and continues to complain of neck pain. X-rays revealed significant degenerative changes at C3-4 and C6-7 including disc space narrowing and apparent spur formation anteriorly. Dr. Nitka opined that the degenerative changes at C3-4 are most likely caused by and the result of the stiffness associated with the adjacent two-level fusions at C4-5 and C5-6 and are the cause of plaintiff's continuing neck pain.
22. Plaintiff returned to Dr. Nitka on February 4, 2004, complaining of worsening neck pain. Dr. Nitka took plaintiff out of work ultimately through February 23, 2004.
23. It is Dr. Nitka's opinion that the degeneration at C3-4 and C6-7 will worsen over time due to the increased stress associated with the two level fusion and consequently it is reasonable that plaintiff be seen on a yearly basis to assess degeneration.
24. The Full Commission finds that there is a substantial risk of the necessity of future medical treatment.
25. It is Dr. Nitka's opinion that as a consequence of the two level cervical fusion and its impact on the two adjacent segments the plaintiff has sustained a thirty-five percent (35%) permanent partial disability of the cervical spine.
26. As a consequence of plaintiff's compensable injuries he was temporarily totally disabled from work for the following periods of time: October 11, 2001 through October 15, *Page 8 
2001; June 20, 2003 through June 30, 2003; July 2, 2003 through November 3, 2003; and February 5, 2004 through February 23, 2004.
27. Plaintiff's average weekly wage is $701.29, yielding a compensation rate of $467.53.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On October 11, 2001, plaintiff sustained a compensable injury by accident consisting of an electrocution injury arising out of and in the course of his employment with defendant-employer. As a result of his injury by accident, plaintiff suffered herniated discs at C4-5 and C5-6. N.C. Gen. Stat. § 97-2.
2. Plaintiff is entitled to temporary total disability compensation at the rate of $467.53 for the following periods: October 11, 2001 through October 15, 2001; June 20, 2003 through June 30, 2003; July 2, 2003 through November 3, 2003; and February 5, 2004 through February 23, 2004. N.C. Gen. Stat. § 97-29.
3. As a result of his compensable injury, plaintiff has a thirty-five percent (35%) permanent partial disability of his cervical spine, for which plaintiff is entitled to compensation at the rate of $467.53 for a period of 105 weeks. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury to his cervical spine, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25. *Page 9 
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay to plaintiff compensation benefits at the rate of $467.53 for the following periods: October 11, 2001 through October 15, 2001; June 20, 2003 through June 30, 2003; July 2, 2003 through November 3, 2003; and February 5, 2004 through February 23, 2004. Compensation due which has accrued shall be paid to plaintiff in a lump sum.
2. For his thirty-five percent (35%) permanent partial disability of his cervical spine, defendants shall pay compensation to plaintiff at the rate of $467.53 per week for a period of 105 weeks. This amount shall be paid to plaintiff in a lump sum, subject to the attorney's fee herein approved.
3. Defendants shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable injury to his cervical spine as long as the same is reasonably designed to effect a cure, provide relief or lessen the plaintiff's period of disability.
4. An award of twenty-five percent (25%) of the compensation due plaintiff under paragraphs 1 and 2 is approved for plaintiff's counsel and shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
5. If not already paid, defendants shall pay an expert witness fee in the amount of $667.00 to Dr. Nitka and an expert witness fee in the amount of $500.00 to Dr. Schulhof.
6. Defendants shall pay the costs.
This the 12th day of June, 2008. *Page 10 
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1